UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BENJAMIN WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 CV 1537 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| COOK COUNTY, Cook County Jail | ) | |
| Correctional Officers DANIEL WEYER, Star | ) | |
| 17565, ANTONIO HUGHES, Star Unknown, | ) | |
| MARIO SPIZZIRRI, Star Unknown, and | ) | |
| THOMAS J. DART, Cook County Sheriff, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>OPINION AND ORDER</u>**

Plaintiff Benjamin Williams, a pretrial detainee at the Cook County Jail ("CCJ"), which

the Cook County Department of Corrections ("CCDC") operates, sued Defendants—Officers

Daniel Weyer, Antonio Hughes, and Mario Spizzirri; Cook County Sheriff Thomas Dart; and

Cook County—under 42 U.S.C. § 1983, for alleged violations of his constitutional right to be

free of excessive force.  Williams alleged that Weyer and Spizzirri used excessive force against

him by sexually assaulting him on three separate occasions (Count I); that each of the defendant

officers failed to protect Williams from the sexual assaults at the hands of the other officers

(Count II); that Sheriff Dart created a culture of allowing officers to sexually harass inmates

without oversight, making him liable under *Monell* (Count III); and that Cook County must

indemnify the other defendants from damages (Count IV).  The undisputed facts show that

Weyer did not sexually assault Williams, the officers did not fail to protect Williams, and Sheriff

Dart did not create a culture that resulted in the officers violating Williams' constitutional rights.

The Court will enter judgment for the Defendants on these claims.  However, because the Court

1

finds a material dispute of fact regarding one of Williams' sexual assault claims against Spizzirri, the Court denies in part and grants in part Spizzirri's motion for summary judgment with respect to Williams' excessive force claims and denies Cook County's motions for summary judgment with respect to Williams' indemnification claim.

## BACKGROUND[1]

### I.     CCDC Policies

CCDC maintains several policies governing its staff's conduct, including policies related to prison rape elimination, inmate searches, and inmate grievances.

### A.     Prison Rape Elimination

The prison rape elimination policy states that there is "zero tolerance for sexual abuse or sexual harassment of persons in Sheriff's Office custody." Doc. 106-15 at 2. In part, the policy defines sexual abuse as "[a]ny other intentional contact, either directly or indirectly or through the clothing, of or with the genitalia . . . . that is unrelated to the official duties or where the staff member . . . has the intent to abuse, arouse, or gratify sexual desire." *Id.* at 3.

### B.     Searches

The inmate search policy details when and how CCDC officers physically search inmates. The policy defines a "[p]at-down search" as one where an officer engages in "a thorough patting down of clothing to locate any weapons or dangerous items that could pose a danger to members, inmates and visitors." Doc. 106-16 at 2. It states that pat-down searches "shall occur frequently within the Department." *Id.* at 3. This include all times that an inmate

---

[1] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts. The Court has considered the parties' objections to the statements of fact and supporting exhibits and included in this background section only those portions of the statements and responses that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment. The Court takes all facts in the light most favorable to Williams, the non-movant.

leaves their living unit, whenever a cell search occurs, when inmates encounter inmates from other living units, when an officer believes an inmate has contraband, and when an inmate is "turned over" from one officer to another. *Id.*

Weyer and Spizzirri both testified to their understandings of how they should perform pat-down searches. Weyer testified that he:

> would have the detainee put his hands on the wall. His feet would be about approximately 18 inches from the wall, shoulder length apart. His arms would be raised on the wall kind of like an arc. And from there I would take a visual before I approach the inmate. I would ask him questions for my safety and his own safety. And I would go from one arm, up and down to the next arm, get the back to the chest, check the waistline of the pants, run my hands along the–his legs on the inner thigh and the outer thigh, both legs, all while watching, looking for anything that was abnormal.

Doc. 106-3 at 41:9–20. Spizzirri, who oversaw a more restrictive part of the jail, said that he:

> would secure [the detainee] in handcuffs, which is something a little different than they do in general population. Once [he was] in handcuffs and secured there, I would unsecure the cell door. [The detainee was] brought out. [He was] instructed to turn around, put [his] hands on the wall, facing the wall. Once that was done, [I] would start with [my] hands at the top of the shoulders and feel out. Obviously [I] come to the bottom of the arms, feel back into the armpit. Okay. [I] would reach across the chest. [I] would feel across the chest and like the stomach area, come down the sides. And obviously all these–what [I am] doing while [I am] conducting these, [I am] actually feeling for any type of foreign object, something that doesn't belong in that nature on [my] hands.
>
> Secondly, I would–obviously when they would first come out, [I] would also have them spread their feet apart. You would come down the–I would go down the right side leg first, usually on the inner–on the inside of the leg and have one hand on the outside of the leg and hit the other hand. I would come down to the ankle, and I would come up almost into the groin area. Where the groin area gets hit, just the very bottom of the groin would bump the back of my hand. Then I would switch to the other leg, perform the same thing.

Doc. 106-5 at 33:6–34:12. CCDC informs inmates in the Inmate Information Handbook that they may be "subject to pat down frisk searches at any time." Doc. 106-8 at 23.

### C. Inmate Grievances

CCDC provides information about the grievance policies to inmates in the Inmate Information Handbook. See Doc. 106-8 at 31–34. The inmate grievance policy allows CCDC inmates to obtain a "a formal review regarding the conditions of their confinement." Doc. 106-19 at 2. It creates "a grievance process for resolving complaints arising from department matters with one level of appeal." *Id.* Inmates who wish to file a grievance obtain grievance forms from CCDC employees. Inmates must file a grievance within fifteen days of the offending incident. If the reviewing authority denies the grievance, the inmate has another fifteen days to appeal the initial decision. The CCDC cautions inmates against filing frivolous grievances, which "may result in disciplinary action." *Id.* at 4. The Director of Inmate Services performs annual audits of inmate grievances to identify policy changes to help reduce the need for future grievances. The Executive Director of the Training Academy ensures that CCDC employees receive initial and ongoing training about the grievance policy, which includes testing to ensure comprehension.

CCDC maintains a related policy regarding grievances about allegations of sexual abuse. Inmates may file grievances with any staff member. Grievances alleging sexual abuse receive expedited attention from the reviewing authorities. The policy also warns inmates that frivolous grievances related to sexual assault will result in discipline.

## II. February 1, 2019 Allegations

### A. Witness Accounts

Williams' complaint alleges that Weyer assaulted him during a routine search while Williams waited for a guard escort to take him to a medical appointment. Williams complains of three specific actions. First, Weyer "suddenly pushed [Williams] into the wall and forcefully

4

handcuffed" him. Doc. 22 ¶ 13. Second, Weyer "pulled the back of [Williams'] pants and underwear away from his body and penetrated [Williams'] rectum with his finger." *Id.* at ¶ 14. Third, Weyer "reach[ed] around to [Williams'] crotch area and grabbed and squeezed [Williams'] genitals over [Williams'] pants." *Id.* at ¶ 15. Williams asked Weyer to return him to his cell so he could file a grievance for this misconduct, but Weyer taunted him instead. Williams then went into an interlock area to return to his cell and told Hughes about Weyer's assault—Hughes brushed off Williams' complaints, communicating that he "did not want anything to do with [Williams'] complaint against Weyer." *Id.* at ¶ 23. After Williams raised his concern to Hughes, Weyer approached Williams again. Williams asserted that he would file a grievance. Weyer pushed him into a wall and forcefully re-cuffed him. After Williams attended his medical appointment, he filed a complaint against Weyer.

Williams testified, while performing an "indicating" motion, *see id.* at 90:7, that Weyer put his thumb in his anus "through my pants," Doc. 106-6 at 89:20. Williams said that the contact was "quick," *id.* at 90:9, and acknowledged that the purpose of any contact around his anus would be "to see do you have a knife in between your ass or up under your nuts so you don't hurt nobody. That's what he was looking for," *id.* at 90:17–20. Williams said that he considered it a sexual assault when a correctional officer "cup[s] somebody's nuts or genitals, testicles . . . . That's sexual assault." *Id.* at 93:22–24. When asked if he thought Weyer was touching him to derive sexual gratification, Williams decided "to keep it real. No. [Weyer] was probably really, really looking for something." *Id.* at 97:3–4.

Williams also testified that when he attempted to return to his cell after the search, he "told Hughes that Weyer grabbed my nuts, squeezed my nuts and my genitals, and put his finger by my ass." *Id.* at 99:12–14. Williams said Hughes did not help him with his complaint against

Weyer. Then, as Weyer was removing the handcuffs from Williams' wrists, Williams "told him I'm finna write him up and whatever." *Id.* at 101:23–24. Weyer became angry, re-cuffed Williams, and sent him "to the hole." *Id.* at 102:3.

In Weyer's recounting of the events, prior to Williams' pat-down, he told "Williams to place his hands on the wall, stand" and then he "searched his body on the outer of his clothing. And after that, I handcuffed him . . . ." Doc. 106-3 at 53:10–14. After Williams went to the interlock area while asking to be returned to his cell, Weyer said that Williams threatened "to kill my kids. On his mom he was going to kill my kids." *Id.* at 56:2–3. Weyer denied threatening Williams, denied putting his hands down Williams' pants, and denied inserting his finger into Williams' anus. Weyer also said he did not recall adjusting the waistbands of Williams' pants or underwear. He further denied asking anyone, including Spizzirri, to threaten or abuse Williams.

Hughes testified that he did not recall his interactions with Williams on February 1, 2019, or the details of any conversations regarding the events of that date, but admitted that he had a conversation with Williams while they were in the interlock. *See* Doc. 106-4 at 26:8–13 ("It was just basically, I believe – I don't know exactly what was said in the video or exactly what he was saying in the video, but I just saw the video of him talking to me about something, but I don't know exactly – recall what he was talking about."). Hughes denied recalling any conversations with Weyer about the incident.

**B. Video Evidence**

Exhibits 1 and 2 captured Williams' interactions with CCDC officers during the incident. The camera shows Williams putting on his uniform shirt in the interlock and waiting to enter the main hallway. Ex. 2 at 00:08–20. He exits the interlock, *id.* at 00:20–24, and then appears in the hallway at the bottom of the frame visible in the recording captured in Exhibit 1, walking

6

towards the top of the frame. Ex. 1 at 15:24. Weyer enters the hallway walking towards Williams with a pair of handcuffs in his left hand, pausing to set some papers down or hand them off to another officer out of view. *Id.* at 15:28–33. Weyer then approaches Williams and gestures at him to turn around to face the wall. *Id.* at 15:34–36. Williams, wiping his glasses with his hands, ignores Weyer's order until Weyer stands directly in front of him. *Id.* at 15:37–44. Williams then places his glasses on his face, turns to the wall, and places his hands against it to prepare for Weyer's search. *Id.* at 15:45–48. Weyer begins his pat-down, starting with Williams' shoulders and sides, moving down to pat the outside of Williams' legs. *Id.* at 15:48–52. Weyer then hooks his finger inside Williams' waistband, pulls his waistband out, and runs his hands along the inside of Williams' pants before pulling them further up on Williams. *Id.* at 15:52–54. Weyer then pats the sides of Williams' legs before running his right hand along Williams' left buttock, concluding the first search. *Id.* at 15:54–56. This search lasted nine seconds, *see id.* at 15:48–56.[2] Weyer then taps Williams on the back twice, and Williams lowers his arms to his side in response, stepping back from the wall. *Id.* at 15:57–16:00. Weyer grabs Williams' right wrist, locks one handcuff on it, and then secures Williams' left wrist in the other cuff. *Id.* at 16:00–08. Weyer then pats Williams down a second time, grabbing his outer left thigh, his inner left thigh, his inner right thigh, and outer-right thigh, finishing with a light tap on the left buttock. *Id.* at 16:08–10. The second search lasted two seconds. *See id.*

### C. Williams' Grievance

Williams filed a grievance against Weyer on February 1, 2019 complaining about the pat-down. Williams, who testified that he is illiterate, said Weyer "fondling and squeeze my

---

[2] According to Williams' testimony, this search constituted the entirety of the alleged sexual assault. *See* Doc. 106-6 at 119:19–21. For completeness' sake, the Court describes the remainder of the video footage related to the pat-down.

7

Genitals . . . And Put his finger And my rectum." Doc. 106-7 at 2. Williams also reported that "As I walk To The interlock To Tell Sheriff hughes I Need help I was sexual Assault I will Like medical help And To call my mom Sheriff Lombardi Say No You going To Shu." *Id.* The reviewing officer denied Williams' grievance on February 5, 2019, and Williams appealed the same day. The CCJ's Superintendent and Assistant Executive Director denied Williams' appeal. They wrote that the video footage did not show that Weyer sexually assaulted Williams and found that Williams' "grievance is frivolous in nature . . . ." *Id.* at 6.

### III. February 2, 2019 Allegations

Williams' complaint alleges that Spizzirri first assaulted him on February 2, 2019. According to the complaint, Spizzirri handcuffed Williams, patted him down, and, "like Weyer had done before him, . . . squeezed [Williams'] genitals[.]" Doc. 22 ¶ 36. Spizzirri also allegedly threatened Williams with death at the hands of other correctional officers for filing a complaint against Weyer. Williams testified that "Spizzirri basically did me like this too (indicating). As he patted me down, he did me like that, the same shit Weyer did, same stuff." Doc. 106-6 at 127:2–4. Williams also said that Spizzirri would always "say some . . . slick shit in my ear," *id.* at 86:17–19, and that Spizzirri said he touched Williams the way he did because "because of [Williams] reporting Weyer[,]" *id.* at 128:13–14. Williams further testified that he considered Spizzirri's touching a sexual assault, although he acknowledged that "they search you like that in special housing unit anyway so they can make sure you don't got nothing." *Id.* at 128:17–18. Williams could not tell if Spizzirri was deriving sexual gratification from the search. *Id.* at 129:10–11. Spizzirri did not recall interacting with Williams on February 2, 2019. *See* Doc. 106-5 at 39:2–5. Spizzirri also testified that Weyer never asked him to retaliate against Williams for filing a grievance form against him. *Id.* at 48:9–14.

8

There is no evidence that Williams filed a grievance related to the February 2, 2019 alleged assault.

## IV.    February 6, 2019 Allegations

Williams' complaint alleges that Spizzirri assaulted him for a second time on February 6, 2019.  According to the complaint, Spizzirri once again grabbed Williams' genitals while patting him down and threatened to kill him for filing a grievance against Weyer.  Williams testified that Spizzirri "squeezed [his] nuts" during the pat-down, Doc. 106-6 at 136:2, but could not remember whether Spizzirri threatened him, *id.* at 135:6–8.  Spizzirri has no recollection of his interaction with Williams on February 6, 2019.

Williams filed a grievance against Spizzirri regarding the February 6 alleged assault on February 10, 2019, claiming only that Spizzirri threatened to kill him.  *See* Doc. 106-7 at 17. The reviewing official denied this grievance and Williams' subsequent appeal after CCDC staff investigated the allegations.  *Id.* at 18 (indicating that the "Administrator/Designee" did not accept Williams' appeal).  Williams filed another grievance against Spizzirri on February 17, 2019, claiming that Spizzirri sexually assaulted him on "2-12-2019" in retaliation for his grievance against Weyer.  *See id.* at 11.  The CCJ's Superintendent and Assistant Executive Director dismissed this grievance after an investigation and subsequent appeal, finding it "frivolous[.]"  *Id.* at 16.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to

9

interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Brown v. Osmundson*, 38 F.4th 545, 549 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I. Excessive Force

Pretrial detainees bring excessive force claims under the Fourteenth Amendment because "their detention is unrelated to punishment." *Hardeman v. Curran*, 933 F.3d 816, 821 (7th Cir. 2019). As such, "a pretrial detainee must show only that the force purposely or knowingly used

10

against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). A plaintiff meets this standard by showing "objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id.* at 398. "However, the Due Process Clause affords pretrial detainees at least as much protection as the Eighth Amendment provides to convicted prisoners." *Edwards v. Byrd*, 750 F.3d 728, 732 (8th Cir. 2014); *see Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[T]he Government concededly may detain [a suspect] to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, *or otherwise violate the Constitution*." (emphasis added)). "Therefore, if the use of force in this case would have violated the Eighth Amendment had the plaintiff[] been [a] prisoner[], that conduct necessarily violated the plaintiff['s] rights under the Fourteenth Amendment." *Edwards*, 750 F.3d at 732.

An officer does not violate a detainee's constitutional rights if the officer's "force was applied in a good-faith effort to maintain or restore discipline . . . ." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). "In the context of searches of prisoners, only searches that are maliciously motivated, unrelated to institutional security, and lack a legitimate penological justification violate the Eighth Amendment." *Rivera v. Drake*, 497 F. App'x 635, 637 (7th Cir. 2012) (citing *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004)). Although "de minimis uses of force are non-actionable," *Hendrickson v. Cooper*, 589 F.3d 887, 890 (7th Cir. 2009), an "'unwanted touching' of a prisoner's private parts can violate Eighth Amendment rights if the officer 'intended to humiliate the victim or gratify [his own] sexual desires,'" *Holloway v. Doe*, --- F. App'x ---, 2023 WL 7412949, at *1 (7th Cir. Nov. 8, 2023) (quoting *Washington v. Hively*, 695 F.3d 641, 643 (7th Cir. 2012)), regardless of the amount of time the unwelcome contact lasts, *see*

11

*Hively*, 695 F.3d at 642 (holding that "five to seven seconds [of] gratuitously fondling the plaintiff's testicles and penis" violated pre-trial detainee's constitutional rights).

### A. Weyer

Weyer is entitled to summary judgment on Williams' excessive force claim because the video evidence of his February 1, 2019 search uncontrovertibly shows that no assault occurred, meaning that Weyer did not use "objectively unreasonable" force. *Hendrickson*, 576 U.S. at 397; *see Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[Plaintiff]'s version of events is so utterly discredited by the record that no reasonable jury could have believed him."). Although it is "a rare case where video evidence leaves no room for interpretation by a fact finder," *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023), the video in this case, as described above, proves conclusively that Weyer did not sexually assault Williams.

The video evidence uniformly disproves each of Williams' three excessive force allegations. First, Weyer allegedly "pushed [Williams] into the wall and forcefully handcuffed" him. Doc. 22 ¶ 13. The video shows that Weyer never pushed Williams into the wall—Williams only touched the wall one time when he placed his hands against the cinderblocks. *See* Ex. 1 at 15:45–48; *see also id.* at 15:57–16:10. Second, Weyer allegedly "pulled the back of [Williams'] pants and underwear away from his body and penetrated [Williams'] rectum with his finger." Doc. 22 ¶ 14. The video shows that Weyer never pulled Williams' underwear off his body nor penetrated Williams' rectum—Weyer only pulled the waistband of Williams' pants back while running his hands along the seam, and never inserted his fingers or thumbs into Williams' rectum. *See* Ex. 1 at 15:52–54; *see id.* at 15:48–16:10. Third, Weyer allegedly "reach[ed] around to [Williams'] crotch area and grabbed and squeezed [Williams'] genitals over [Williams'] pants." Doc. 22 at ¶ 15. The video shows that Weyer never reached around

Williams to grab Williams' genitals over his pants—Weyer only places his hands on the inside and outside of Williams' thighs twice during the search, which follows CCDC's policy of how officers should search inmates for contraband. *See* Ex. 1 at 15:54–56; *see also* Doc. 106-16 at 2–4 (defining "pat-down search[es]" and discussing their use). Each of Williams' allegations flounders in the face of the video evidence, *see Scott* 550 U.S. at 380. Consequently, he cannot show that Weyer's conduct was "objectionably unreasonable," *Kingsley*, 576 U.S. at 397.

In response to this overwhelming evidence refuting his allegations, Williams only claims that the camera that captured Exhibit 1's video feed was poorly placed and that the Court must therefore accept his version of the events. Doc. 127 at 6. As reflected by the Court's comprehensive description of the video exhibits above, the footage presents a clear and unobstructed view of the events as they unfolded on February 1, 2019. The videos' clarity makes this the "rare case" where summary judgment is warranted despite Williams' conflicting testimony. *Kailin*, 77 F.4th at 481. But even if Williams was correct that the Court could not properly evaluate Weyer's search due to the camera angle, his claim against Weyer would still fail summary judgment. Williams himself admitted that Weyer "was probably really, really looking for something," Doc. 106-6 at 97:3–4, and that any incidental contact with his anus or genitals would be "to see [if] you have a knife in between your ass or up under your nuts so you don't hurt nobody[,]" *id.* at 90:17–20. Williams does not allege that Weyer's search was "intended to humiliate the victim or gratify [Weyer's] sexual desires." *Hively*, 695 F.3d at 643. Rather Williams acknowledged that Weyer's search constituted a standard pat-down "rationally related to a legitimate governmental objective," namely safety, *Hendrickson*, 576 U.S. at 398; *see* Doc. 106-16 at 3 (describing circumstances where officers must search inmates). Thus, although it is unfortunate that Williams felt discomforted and violated by Weyer's search, the

13

Court cannot say that it violated his constitutional rights because Weyer's conduct was objectively reasonable.

The Court grants Weyer summary judgment on Williams' excessive force claim.

**B.      Spizzirri**

Williams alleges that Spizzirri sexually assaulted him twice—first on February 2, 2019 and then again on February 6, 2019—in retaliation for his administrative complaint against Williams.[3]

    **a.  February 2, 2019**

Unlike the February 1, 2019 incident, the Court has no video to review that would allow it to objectively analyze the propriety of Spizzirri's conduct.  With respect to the February 2, 2019 alleged assault, the Court only has conflicting deposition testimony where, on the one hand, Williams alleges that Spizzirri "squeezed [his] nuts," Doc. 106-6 at 136:2, and threatened him for filing a complaint against Weyer, and, on the other hand, Spizzirri simply denies that any of this happened in that he failed to recall whether he engaged in such conduct.  If Williams' version of events is true, and Spizzirri squeezed his genitals to deliberately inflict pain in retaliation for Williams' grievance against Weyer, it unquestionably constitutes sexual assault and a violation of Williams' constitutional rights.  *See Rivera*, 497 F. App'x at 637 (finding maliciously motivated searches violate Eighth Amendment); *Hively*, 695 F.3d at 642 (finding

---

[3] Whether Williams failed to exhaust his administrative remedies with respect to the February 2 and February 6, 2019 alleged assaults is an open question, especially given that there is no evidence of a grievance related to the February 2, 2019 incident and the grievance Williams filed on February 10, 2019 only relates to threats Spizzirri allegedly made against Williams.  *See* Doc. 106-7 at 17; *see also* 42 U.S.C. § 1997e(a) (requiring incarcerated individuals to exhaust available administrative remedies before filing lawsuit claiming violation of constitutional rights under 42 U.S.C. § 1983 or any other federal law). The Court, having no briefing from the parties regarding Williams' potential non-compliance with the administrative exhaustion requirements, will not answer it here.

sexual assault violates pre-trial detainee's constitutional rights); *Edwards*, 750 F.3d at 732 (holding Eighth Amendment violations necessarily violate pre-trial detainee's rights).[4]

Although Spizzirri martials several arguments as to why the Court should grant his motion, they all boil down to mere contradictions of Williams' testimony, which crystalize the material dispute of fact between the parties. First, Spizzirri argues that he would never conduct a pat-down search that conflicted with his training. This is a simple denial of Williams' versions of events: when confronted with "a swearing contest" between two parties, *Chittum v. Hare*, No. 21-2129, 2022 WL 3584667, at *3 (7th Cir. Aug. 22, 2022), the non-movant always wins, *see Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021) ("Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied."). Second, Spizzirri argues that Williams cannot show that Spizzirri made more than a brief contact with his genitals. This only attempts to minimize Williams' testimony, *compare* Doc. 104 at 17 ("Plaintiff must do more than show that Defendant Spizzirri made brief contact with his private areas."), *with* Doc. 106-6 at 136:2 (testifying that Spizzirri "squeezed [his] nuts"), which is impermissible, *see Gupta*, 19 F.4th at 996. Finally, Spizzirri claims that Williams' testimony is all self-serving. This does not give the Court reason to disregard or discredit it. *See Chittum*, 2022 WL 3584667, at *4 ("In court, credibility is a jury

---

[4] Indeed, because case law long-establishes that an inmate has the right to be free from abuse at the hands of correctional officers, *see, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994) (inmates have right to be free from being "violently assaulted in prison"); *Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005) (noting that right to be free from deliberate indifference to sexual assault is clearly established); *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000) ("In the simplest and most absolute of terms, the Eighth Amendment right of prisoners to be free from sexual abuse was unquestionably clearly established prior to the time of this alleged assault [in the mid-1990s], and no reasonable prison guard could possibly have believed otherwise."), the Court denies Spizzirri's request for qualified immunity. *See Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (considering "(1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether the constitutional right was clearly established at [that] time").

question, and there is nothing wrong with providing [Williams'] own testimony in opposition to a summary judgment motion.").

A reasonable jury could resolve this swearing contest in Williams' favor, believing that Spizzirri violated his constitutional rights by maliciously squeezing Williams' genitals in retaliation for filing a complaint against a fellow correctional officer. *See Hively*, 695 F.3d at 644 ("We don't see how the defendant's conduct if correctly described by the plaintiff could be thought a proper incident of a pat down or search, and the defendant doesn't contend that it could be; his defense rather is that his conduct has been misdescribed."). Because Spizzirri's alleged misconduct on February 2, 2019, if it occurred, would have violated Williams' Eighth Amendment rights, it necessarily would have violated his Fourteenth Amendment rights as well. *Edwards*, 750 F.3d at 732. Thus, the Court allows Williams to pursue this claim.

### b.  February 6, 2019

However, Williams claim against Spizzirri for his alleged misconduct on February 6, 2019, fails because Williams could not answer in his deposition whether Spizzirri threatened him while performing the pat-down. *See* Doc. 106-6 at 135:6–8. A correctional officer's pat-down, without evidence that shows the officer is performing it for a malicious purpose, is objectively reasonable and does not violate a pre-trial detainee's Fourteenth Amendment rights. *See Kingsley*, 576 U.S. at 398 (holding that pre-trial detainee must show "objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose"); *see also Hudson*, 503 U.S. at 7 (good-faith application of force to inmate does not violate constitutional rights); *Drake*, 497 F. App'x at 637 ("In the context of searches of prisoners, only searches that are maliciously motivated, unrelated to institutional security, and lack a legitimate penological justification violate the Eighth

16

Amendment.") CCDC policy requires officers to conduct "a thorough patting down of clothing to locate any weapons or dangerous items that could pose a danger to members, inmates and visitors." Doc. 106-16 at 2. They must "frequently" perform these searches. *Id.* at 3. Even though Williams claims that he felt discomfort during the pat-down, that does not mean that Spizzirri's conduct was objectively unreasonable. *Cooper*, 589 F.3d at 890 (holding that "de minimis uses of force are non-actionable"). While Williams alleges in his complaint that Spizzirri said that he was mistreating Williams because of the grievance against Weyer, Williams must point to *evidence*, not *allegations*, supporting his claim. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk*, 770 F.3d at 627. Because Williams failed to point to objective evidence that Spizzirri's conduct on February 6, 2019 was improper, the Court grants Spizzirri's motion for summary judgment on that claim. *Kingsley*, 576 U.S. at 398.

Accordingly, the Court grants in part and denies in part Spizzirri's motion for summary judgment on Williams' excessive force claims.

## II.    Failure to Protect

Wilson's second claim charges Weyer, Spizzirri, and Hughes with failing to protect him from excessive force. Doc. 49 ¶ 53. A failure-to-protect claim consists of four elements: "(1) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) those conditions put the plaintiff at substantial risk of suffering serious harm; (3) the defendant did not take reasonable available measures to abate the risk*, even though a reasonable officer under the circumstances would have appreciated the high degree of risk involved*, making the consequences of the defendant's inaction obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries." *Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022) (citing *Kemp v. Fulton County*, 27 F.4th 491, 496 (7th Cir. 2022)). "[T]he

defendant officer must intend to carry out a certain course of actions; negligence is not enough. At that point, the remaining question is whether that course is objectively reasonable. If not, there is a Fourteenth Amendment violation." *Kemp*, 27 F.4th at 497. "A failure to protect claim requires 'a 'strong likelihood' rather than a 'mere possibility' that violence will occur' in order to impose liability." *Hamilton v. Gavin*, No. 22 C 2285, 2023 WL 2161663, at *5 (N.D. Ill. Feb. 22, 2023) (quoting *Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 2006)).

### A. Weyer

Weyer moves for summary judgment against Williams' claims that Weyer failed to protect him from the assault he allegedly committed on February 1, 2019, or the assaults Spizzirri allegedly committed on February 2, 2019 and February 6, 2019. Weyer argues that Williams' first claim is "inherently deficient," and that he was never on notice of the heightened risk that Spizzirri would allegedly retaliate against Williams for filing a grievance. Doc. 114 at 10–11. In response, Williams denies bringing a failure to protect claim related to the February 1, 2019 incident (instead saying his claim only relates to the February 2 and 6, 2019 alleged assaults). Instead, he argues that the fact Spizzirri learned of the February 1, 2019 incident permits the inference that Weyer spoke with him about the grievance, meaning Weyer appreciated that there was a heightened risk of Spizzirri assaulting Williams in retaliation. Doc. 127 at 8–10.

Williams' failure to protect claims fails against Weyer because none of the facts show that Weyer made decisions regarding Williams' confinement or that Weyer was aware of a heightened risk that Spizzirri would harm Williams. *See Thomas*, 39 F.4th at 841; *Kemp*, 27 F.4th at 497 ("The defendants also argue persuasively that [plaintiff] did not present any evidence showing that any of them was on notice of a serious risk of harm to him."). Even if the

18

Court credits Williams with the inference he asks it to draw, it does not mean that Weyer failed to protect Williams against Spizzirri's alleged assault. For the Court to find that Williams can bring this claim, it must also infer that it was obvious that a reasonable officer would have known or believed that Spizzirri would interact with Williams in the near-future and would retaliate against Williams on his behalf, and that Weyer ignored this risk. *See Thomas*, 39 F.4th at 841 (holding that officer needs to appreciate heightened risk of harm to inmate to be held liable for failure to protect). There is no evidence in the record that suggests Weyer asked Spizzirri to retaliate on his behalf, or that Spizzirri had a history of retaliating against inmates for filing grievances. Without such evidence, the inference that a reasonable officer would have been aware of the risk that Spizzirri posed is not "supported by admissible evidence," so Williams is not entitled to it. *Grant*, 870 F.3d at 568. Williams' only evidence to support his failure to protect claim against Weyer is an inference that Weyer told Spizzirri about his grievance (allegedly leading to the assault), and his own testimony that Spizzirri retaliated against him on Weyer's behalf. Standing alone, this evidence does not support a failure to protect claim. *See Thomas*, 39 F.4th at 841; *see also Hamilton*, 2023 WL 2161663, at *5 (failure to protect claim requires more than "a mere possibility" that harm would result). The Court, thus, grants summary judgment to Weyer on Williams' failure to protect claims.

    **B.**    **Spizzirri**

       Spizzirri moves for summary judgment against Williams' claim that Spizzirri failed to protect Williams against Weyer's assault on February 1, 2019. Doc. 104 at 7. In response—and similar to his response to Weyer—Williams claims that he does not bring a failure to protect claim against Spizzirri for the February 1 incident, but rather brings claims against him for the

February 2 and 6, 2019 assaults. Doc. 128 at 7. These claims are incompatible with Williams'
excessive force claim, so the Court will grant Spizzirri's motion for summary judgment.

At the heart of a failure to protect claim is the question, failure to protect *from what*?
Here, Williams answers that Spizzirri himself was both the danger and his guardian. This simply
cannot be right. The elements of a failure to protect claim presuppose a "risk" of which a
reasonable officer would be aware and seek to abate for the inmate's safety. *See Thomas*, 39
F.4th at 841. These risks generally concern harm arising from *other* inmates, *see Brown v. Budz*,
398 F.3d 904, 911 (7th Cir. 2005) ("a beating suffered at the hands of a fellow detainee . . .
clearly constitutes serious harm[.]"), *other* correctional officers, *see Jackson v. Baldwin*, No. 18
C 6457, 2021 WL 3142172, at * (N.D. Ill. July 26, 2021) (failure to protect claim can arise from
"placing an inmate in the proximity of correctional officers that have threatened to harm him"),
or the *inmate himself*, *see Miranda v. County of Lake*, 900 F.3d 335, 349 (7th Cir. 2018) ("failure
to protect an inmate from self-harm [is] one way of establishing deliberate indifference to a
serious medical need"). Notably, these examples all reflect external sources of risk—absent
from these categories is harm from the correctional officer whom a plaintiff accuses of posing
the risk from which *other* officers must protect. The Court will not break new ground to permit
Williams' attempt to double-dip his claims.[5]

Because Williams fails to identify an external risk against which Spizzirri failed to
protect him, the Court grants Spizzirri summary judgment on Williams' failure to protect claims.
*See Thomas*, 39 F.4th at 841.

---

[5] In any event, bringing this claim against Spizzirri does Williams no good because his excessive force
and failure to protect claims are completely intertwined. If a jury determines that Spizzirri did not
sexually assault Williams, then there would have been no risk against which Spizzirri could have
protected Williams. The reverse is also true: if a jury finds Spizzirri liable for the alleged assault, then he
also would have necessarily failed to protect Williams against the threat that he posed.

20

C.      **Hughes**

The Court now turns to Hughes' motion for summary judgment on Williams' failure to protect claim.  Hughes makes a threshold argument that Williams failed to exhaust his administrative remedies, meaning his claim must be dismissed under the Prisoner Litigation Reform Act ("PLRA").  *See* 42 U.S.C. § 1997e(a) (requiring incarcerated individuals to exhaust available administrative remedies before filing lawsuit claiming violation of constitutional rights under 42 U.S.C. § 1983 or any other federal law).  Hughes claims that because the grievance Williams filed related to the February 1, 2019 incident with Weyer is "substantially different than the allegations in his lawsuit," Doc. 104 at 3–4 (citing *Bowers v. Dart*, 1 F.4th 513, 517 (7th Cir. 2021)), the Court should bar the complaint against him.  However, Williams (once again) disavows any claim that Hughes failed to protect him from the events on February 1, 2019, so the Court need not consider whether Williams failed to exhaust his administrative remedies with respect to that incident.  *See* Doc. 128 at 7.  Instead, Williams asserts that Hughes failed to protect him against Spizzirri's alleged assaults on February 2, 2019 and February 6, 2019, and that Hughes failed to seek summary judgment on his claims related to these events.[6]  *See id*.  Williams thus contends that his failure to protect claims against Hughes must move forward.

This argument is baseless.  Aside from being a patently incorrect reading of Hughes' summary judgment briefing, *see* Doc. 104 at 12 ("[T]here is nothing in the record to show Defendant Hughes was present for, or observed, *the pat down searches that occurred on February 2, 2019 and February 6, 2019*.  Thus, summary judgment should be granted . . . ."

---

[6] Hughes does not address in his reply whether Williams failed to exhaust his administrative remedies with respect to his failure to protect allegations related to the February 2, 2019 or February 6, 2019 incidents.  Thus, the Court does not consider whether Williams waived these claims by failing to raise them in his grievances.  *See Jones*, 549 U.S. at 211–12 (finding that failure to exhaust administrative remedies is an affirmative defense that must be raised by a defendant).

(emphasis added)), there are no facts in the record that would suggest that Hughes had any knowledge that Spizzirri would threaten or physically assault Williams on these dates. The *only* material fact in the record regarding Hughes is that he spoke with Williams on February 1, 2019 after Weyer's pat down. *See* Doc. 106 ¶¶ 43, 68; *see also* Doc. 106-4 at 26:8–13 (recounting that Hughes did not "know exactly what was said in the video or exactly what [Williams] was saying in the video, but I just saw the video of him talking to me about something, but I don't know exactly – recall what he was talking about."). The record is silent as to Hughes' actions on February 2, 2019 or February 6, 2019; is barren regarding any conversations between Hughes and Weyer or Spizzirri that might have alerted Hughes to plans Spizzirri might have had to retaliate against Williams; and is devoid of any evidence that suggests that Hughes was in a position to protect Williams from the risk Spizzirri posed. *See generally* Doc. 106; *see also Thomas*, 39 F.4th at 841 (officer must be in position to take action to mitigate risk to inmate to be liable on failure to protect theory). Given that § 1983 claims require "personal involvement in the alleged constitutional deprivation," *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010), and that Williams has not pointed to any evidence showing that Hughes participated in any of the events of which he complains, *see Bellaver*, 200 F.3d at 492 (mere contention without supporting evidence by non-moving party is insufficient to defeat summary judgment), the Court grants summary judgment to Hughes on Williams' failure-to-protect claims.

## III.  *Monell* Liability

In his complaint, Williams alleges that Sherrif Dart is liable under *Monell* for implementing policies allowing excessive force against CCDC pretrial detainees; failing to adequately supervise and discipline officers; failing to appropriately investigate complaints and grievances against correction officers for misconduct; and failing to deter correctional officers

from engaging in misconduct by failing to adequately supervise and discipline them. To advance these allegations Williams must satisfy the three elements of his *prima facie* case. First, he must show that an unconstitutional policy exists. He can do this with evidence of "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (quoting *Estate of Sims ex rel. Sims v. Cty. Of Bureau*, 506 F.3d 509, 515 (7th Cir. 2007)). Second, Williams must show that Sherrif Dart was deliberately indifferent to a known or obvious risk that the unconstitutional policy would lead to violations of constitutional rights. *See Board of Com'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407, 410 (1997). Third, Williams must show that Sherrif Dart's policy "directly caused a deprivation of [his] federal rights." *Id.* at 415. Because Williams cannot show the existence of an unconstitutional policy, his *Monell* claim fails, and the Court grants Sherrif Dart's motion for summary judgment.

Several CCDC policies govern correctional officers' conduct, interactions with inmates, and discipline. The CCDC maintains robust policies prohibiting sexual abuse of inmates at the hands of correctional officers, *see* Doc. 106-15, dictating when inmates must be searched by correctional officers and how those searches should be conducted, *see* Doc. 106-16; *see also* Doc. 106-3 at 41:9–20 (Weyer's testimony regarding how he would conduct searches); Doc. 106-5 at 33:6–34:12 (Spizzirri's testimony regarding the same), and how inmates may obtain redress for mistreatment they experience at the hands of correctional officers, *see* Doc. 106-19. The evidence shows that, with the exception of Spizzirri's alleged inappropriate contact with Williams, the relevant parties followed these policies. Weyer's search was above-board, and

Williams successfully filed several grievances regarding the alleged sexual assaults and received timely decisions. Thus, Williams can only show that Sherrif Dart implemented unconstitutional policies that directly lead to his constitutional injury by proving the existence of a "widespread practice" of permitting officers to sexually assault inmates, failing to investigate the officers and incidents when inmates complain, and failing to discipline the officers who engage in such conduct. *Spiegel*, 916 F.3d at 617.

Williams argues that evidence regarding Spizzirri's February 2 and 6, 2019 alleged assaults are sufficient to show that such a culture exists,[7] and that even a "single violation of federal rights can trigger municipal [*Monell*] liability if the violation was a 'highly predictable consequence' of the municipality's failure to act." Doc. 128 at 12 (quoting *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004)). In *Woodward*, a deceased inmate's grandmother sued the medical provider at the facility in which Lake County incarcerated her grandson after he hanged himself with a bedsheet while awaiting trial on attempted sexual assault of a minor charges. Although the medical provider had policies in place to prevent inmate suicide, an expert testified that it "systematically ignored its own suicide prevention procedures." *Woodward*, 368 F.3d at 926. *Woodward*'s facts present a stark contrast with the facts of this case, which show that Weyer complied with the CCDC's policy regarding inmate searches and that CCDC staff followed the CCDC's inmate grievance policy. Moreover, in rejecting the medical provider's argument that a single suicide could not create *Monell* liability, the court noted that "there was a direct link between CMS's policies and [the inmate's] suicide. That no one in the past committed suicide simply shows that [the medical provider] was

---

[7] Williams argues that Weyer's pat-down on February 1, 2019 contributes to the evidence supporting his *Monell* claim, but the Court will not consider it in light of its decision to grant summary judgment to Weyer on the excessive force claim.

24

fortunate, not that it wasn't deliberately indifferent." *Id.* at 929. Here, Williams does not point to any evidence that shows Spizzirri's alleged assault resulted from the Defendants' ignoring CCDC policy rather than Spizzirri's subjective desire to take revenge against Williams on Weyer's behalf. The record simply does not support Williams' contention that these isolated events "show[] that the culture within Cook County Jail was so indifferent to detainee wellbeing." Doc. 128 at 12. Accordingly, because Williams cannot show "a direct link between [CCDC's] policies and [Spizzirri's assaults on Williams]," *Woodward*, 368 F.3d at 929, he cannot hold Sherrif Dart liable for the alleged violations of his constitutional rights, *see Spiegel*, 916 F.3d at 618 (affirming dismissal of *Monell* claim in part because "[t]wo [offenses] by officers do not constitute a widespread policy or practice").

Because Williams cannot show that Sherrif Dart implemented an unconstitutional policy, his *Monell* claim fails and the Court grants Sherrif Dart's motion for summary judgment.

## IV.    Indemnification

Since some of Williams' claims survive against Spizzirri, and "Cook County is a nominal defendant in this action only for the purpose of indemnification[,]" Doc. 52 at 1, the Court denies Cook County's motion for summary judgment, *see* 745 Ill. Comp. Stat. 10/9-102 ("A local public entity is empowered and directed to pay any tort judgment . . . for which it or an employee while acting within the scope of his employment is liable . . . .").

**CONCLUSION**

The Court grants Weyer's motion for summary judgment [107]. The Court grants in part and denies in part the remaining Defendants' motions for summary judgment [103]. The Court enters judgment in favor of Sherrif Dart and Officers Hughes and Weyers on Williams' first amended complaint and dismisses them from this case. The Court enters judgment in favor of Officer Spizzirri on Williams' failure to protect claim. Williams' sole remaining claims are his excessive force claim against Spizzirri, and his indemnification claim against Cook County.

Dated: December 4, 2023

_____

SARA L. ELLIS
United States District Judge

26